UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 3:18-CR-084 JD |
| | ) |
| ERIC FORD (02) | ) |

**OPINION AND ORDER**

On June 12, 2018, police officers executed a search warrant for drugs and drug paraphernalia at a residential garage in which Defendant Eric Ford usually slept. While conducting the search, the officers observed a sawed-off shotgun in plain view and seized it. The government subsequently charged Ford with one count of possessing a sawed-off shotgun, in violation of 26 U.S.C. §§ 5822, 5861(c), and 5871. Ford now moves to suppress the shotgun seized during the garage search [DE 51], and the parties have submitted a set of stipulated facts in lieu of an evidentiary hearing. [DE 85][1] For the reasons set forth below, the Court will deny Ford's motion to suppress.

**FACTUAL BACKGROUND**

As stipulated by the parties, just before midnight on June 12, 2018, officers with the South Bend Police Department surrounded a garage located at 1710 Medora Street in South Bend, Indiana. They had with them an arrest warrant for Joshua Kendall (Ford's codefendant in this case) and had received a tip that Kendall was inside the garage. Officers knew that Kendall had a prior conviction for a crime of violence and considered him dangerous and possibly armed.

---

[1] Ford's motion states that he seeks to "suppress *all items* seized as a result of the search" of his bedroom and any statements, photographs, and videos directly stemming from the purportedly illegal search [DE 51 at 4] (emphasis added), but it is clear from his briefs that his request pertains specifically to the sawed-off shotgun, and so the Court will focus on that item. Indeed, the other items seized—such as drugs and drug paraphernalia, a revolver, and a rifle with a silencer—are not relevant to Ford's federal case.

1

Officers noticed that the garage itself had security cameras mounted outside. The garage door was open and officers heard music emanating from a room inside the garage, which was segregated by a closed door. The officers then conducted a "call out" and ordered the garage's occupants outside. Four individuals emerged from the garage's inner room with their hands up: Joshua Kendall, Eric Ford, and two women. The officers could not fully see into the inner room from outside the garage, so once they secured the four individuals, three officers performed a quick protective sweep of the room (which turned out to be Ford's bedroom) to determine if anyone else had remained inside. The sweep "was very quick and involved the officers only looking where any other person might be hiding." [DE 85 at 2] During this sweep, the officers detected a strong odor of raw marijuana and observed "several firearms and ammunition throughout the room," in the open. *Id.*[2]

Based on their observations, officers applied for a warrant to search the room for illegal drugs and paraphernalia, firearms, and ammunition. The officers presented the application to a state court judge, who then issued a search warrant for "drug evidence, to wit, drugs, drug paraphernalia, scales, packaging items, and any other items related to drugs." [DE 73 at 9] The state court judge, however, denied the officers' request to search for firearms and ammunition.

Armed with the search warrant, officers searched the garage bedroom and located and seized evidence of illegal drug activity, namely, marijuana, smoking pipes, and four digital scales. *Id.* at 10. Officers also summoned ATF task force agent Sheldon Scott to the scene "to come and seize the firearms." [DE 85 at 3] Scott then seized ammunition, a suppressed rifle, a revolver, and a sawed-off shotgun. The shotgun was sitting in plain view on top of a dresser or cabinet in the bedroom.

---

[2] The record does not indicate whether the sawed-off shotgun was among the firearms spotted by the officers during the protective sweep.

**DISCUSSION**

As stated at the outset, Ford seeks to suppress the shotgun seized from his bedroom in the garage. He advances two main legal arguments: first, that the officers conducted an unreasonable protective sweep of the bedroom; and second, that the officers later exceeded the scope of the search warrant when they seized the shotgun. These arguments do not persuade the Court.

**A.     Protective Sweep**

Ford first contests the officers' justification for conducting a protective sweep of the bedroom inside the garage, during which they detected the strong odor of marijuana that provided probable cause for the subsequent search warrant. He argues that the officers did not have grounds to conduct the sweep because they had already completed their arrest of Kendall outside the garage and because they had no reason to believe that another person posing a threat could have remained inside the bedroom. Although the officers did not seize any evidence during their sweep, Ford argues that because the sweep was not justified, any evidence seized pursuant to the later search warrant must be excluded as fruit of the poisonous tree.

"A 'protective sweep' is a quick and limited search of premises, incident to arrest conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Officers do not need a search warrant in order to conduct a protective sweep. *United States v. Henderson*, 748 F.3d 788, 791 (7th Cir. 2014). Instead, the Fourth Amendment permits a protective sweep "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 327 (internal citations omitted). A protective sweep is "not a full search of the premises," *id.* at 335, and is "limited to a cursory inspection into spaces

where other assailants may be hiding and must not last 'longer than is necessary to dispel the reasonable suspicion of danger.'" *Henderson*, 748 F.3d at 791 (quoting *id.*).

The inquiry into whether a protective sweep is reasonable "is an exceptionally fact-intensive one in which we must analyze myriad factors including, among other considerations, the configuration of the dwelling, the general surroundings, and the opportunities for ambush. *United States v. Starnes*, 741 F.3d 804, 808 (7th Cir. 2013) (citing *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995)). Three factors guide this inquiry: (1) the sweep must be based on more than a mere inchoate and unparticularized suspicion or hunch regarding the danger; (2) the search must be cursory, lasting no longer than is needed to dispel the officers' reasonable suspicion of danger; and (3) the search must be limited to a cursory visual inspection of places where a person might be hiding. *Starnes*, 741 F.3d at 804 (internal citations omitted).

In this case, officers surrounded the garage prior to executing an outstanding arrest warrant on one of its occupants, Joshua Kendall. Officers knew that Kendall had been previously convicted of a crime of violence and considered him dangerous and possibly armed. Officers also noticed security cameras outside the garage, which would provide them reason to suspect that their approach, movements, and positions were under observation from inside the garage or from elsewhere, and perhaps by Kendall himself. Four people exited from the bedroom in response to the officers' instructions, but the officers could not fully see into that room, and so they had no way of knowing whether another person, potentially armed, remained within.

Given these facts, the officers' sweep was based on more than an inchoate, unparticularized suspicion regarding potential danger, and the first factor for assessing the reasonableness of a protective sweep has been met. Ford insists that the officers had no reason to suspect that someone could have remained inside the garage after the call out, but the Seventh

4

Circuit rejected such a notion in *Henderson*, where the defendant likewise argued that officers needed to confirm whether additional people remained in the house before conducting a protective sweep. 748 F.3d at 792. In affirming the reasonableness of the sweep, the panel made clear that police cannot assume that their orders are always obeyed by every occupant of a room or building: "It is not realistic for police officers to always rely on the statements of people involved at a crime scene; they sometimes provide wrong information, or sometimes flat out lie." *Id.*

In other words, simply because four people exited Ford's bedroom in response to a command for everyone to come out with their hands raised does not rule out the possibility that a fifth person remained inside. Here, at no point prior to the sweep could the officers view the entire interior bedroom from which Ford, Kendall, and the two women exited. Additionally, the officers had reason to believe that their moves were being monitored on camera, making them vulnerable to ambush. The officers also had reason to believe that Kendall was armed; coupled with his violent criminal background, this further justified the officers' protective sweep of the bedroom, especially when they found no weapons on his person. *See id.* ("The SWAT team had information that Henderson possessed a gun but no weapons were found on his person when he was arrested; it was reasonable to infer that an armed and dangerous person remained in the house."); *see also Sutterfield v. City of Milwaukee*, 870 F. Supp. 2d 633, 640-41 (E.D. Wis. 2012), *aff'd*, 751 F.3d 542 (7th Cir. 2014) (finding protective search of home justified where officers "were under the (correct) impression that individual threatening to commit suicide owned a gun, making a firearm likely present in the home."). Finally, the parties stipulate that the officers conducted a "very quick" sweep of the bedroom, during which they "only look[ed]

where any other person might be hiding." [DE 85 at 2] This satisfies the second and third factors discussed in *Starnes*.

Ford attempts to distinguish both *Starnes* and another Seventh Circuit decision regarding protective sweeps, *United States v. Tapia*, 610 F.3d 505 (7th Cir. 2010). In *Starnes*, the court upheld the officers' protective sweep of an entire duplex after they executed a search warrant pertaining to just one of the two units. *See generally*, 741 F.3d 804. The court considered the following facts in support of the sweep: the officers knew in advance that two aggressive guard dogs occupied the house; officers subdued one of the dogs with gunfire upon breaching the door, which could have alerted any occupants; the officers knew a shooting had occurred at the residence just a few hours prior to the search; and they had reliable information that the location served as a base for drug business. *See generally, id.* And in *Tapia*, the court found the officers' protective sweep of a house and its basement justified because the police knew the location to be a gang hideout associated with illegal activity and observed an unoccupied vehicle large enough to fit several persons (and known as belonging to one of defendant's gang associates) parked outside the home. *See generally*, 610 F.3d 505. Ford argues that the instant case does not contain as many "specific and articulable facts" as do *Starnes* and *Tapia*, and therefore, the officers' protective sweep cannot have been justified. But *Starnes* and *Tapia* do not establish a factual threshold that must be met in order for a protective sweep to be reasonable; indeed, referring to both of these decisions, the court in *Henderson* made clear that "we have ensured that our opinions 'neither expand nor contract the law enforcement's right to perform such a sweep' and continue to apply 'the same concise standard announced in *Buie*.'" 748 F.3d at 791 (quoting *Starnes*, 741 F.3d at 811). Ford's garage bedroom was not previously known to officers as a place of regular illegal activity, nor did the officers observe a large vehicle parked outside or

have reason to believe that guard dogs patrolled the property. But as discussed above, the present articulable facts—in their own right—provided a reasonable basis for the officers to believe that Ford's bedroom could be harboring an individual posing further danger to them.

Moreover, the mere fact that the officers arrested Kendall *outside* the garage (as opposed to inside) does not itself preclude them from subsequently conducting a protective sweep of the garage's bedroom, as Ford suggests. In *Henderson*, for example, the defendant had exited the house in response to officers' demands, yet the court upheld a protective sweep of the same house. *See generally*, 748 F.3d 788. Similarly, in *Ray v. Vill. of Woodbridge*, police officers did not violate the Fourth Amendment by conducting a protective sweep of a store where two armed suspects had reportedly threatened others inside the store. 221 F. Supp. 2d 906, 915-16 (N.D. Ill. 2002). Even though the suspects were taken into custody after complying with requests to exit the store, that "did not end the exigency. The Officers could not see into the store from the outside, and for all they knew, there could easily have been additional persons in the store that had weapons, or may have been injured, or were otherwise hiding from the police." *Id.* at 916; *see also Rusinowksi v. Vill. of Hillside*, 19 F. Supp. 3d 798, 808-09 (N.D. Ill. 2014) (finding protective sweep of a house permissible following arrest of an individual outside that house).

Officers in this case had a reasonable basis to suspect that danger remained inside the bedroom after Ford, Kendall, and the two women exited. The protective sweep was therefore justified under the circumstances, and the officers appropriately limited that sweep in time and scope. Because of this, the protective sweep did not run afoul of the Fourth Amendment, and Ford therefore cannot maintain that the sweep poisoned the subsequent search warrant. *See United States v. Crews*, 445 U.S. 463, 470 (1980) (noting that the exclusionary sanction applies to any "'fruits' of a *constitutional violation*") (emphasis added).

**B.    Scope of the Search Warrant**

Next, Ford argues that ATF task force agent Sheldon Scott had no authority to seize the shotgun because firearms were expressly excluded from the search warrant.[3] When the officers executed the search warrant for drugs and related paraphernalia, however, the sawed-off shotgun was sitting "in plain view on top of a dresser or cabinet in the room." [DE 85 at 3, 6] "An officer executing a search warrant may seize: (i) items named in the warrant; and (ii) evidence that, although not described in the warrant, is subject to seizure under the plain view doctrine." *Russell v. Harms*, 397 F.3d 458, 465 (7th Cir. 2005) (citing *Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992)). According to the "plain view" exception to the Fourth Amendment's warrant requirement, "[a] warrantless seizure of an object is justified if: '(1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was 'immediately apparent.'" *United States v. Schmidt*, 700 F.3d 934, 938-39 (7th Cir. 2012) (quoting *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004)).

The second requirement of the plain view doctrine can be addressed at the outset because it is most easily met. The parties stipulate that the shotgun was in plain view on top of a dresser

---

[3] Ford labels this argument as one of collateral estoppel, in that the officers had an opportunity to present their case for a warrant that included a search for firearms but were denied in their request by the state court judge. [DE 73 at 2-4] Thus, according to Ford, collateral estoppel requires suppression of the shotgun in this case. Collateral estoppel "teaches that a judge's ruling on an issue of law or fact in one proceeding binds in a subsequent proceeding the party against whom the judge had ruled, provided that the ruling could have been (or was, but unsuccessfully) challenged on appeal, or if not that at least it was solid, reliable, and final rather than intended to be tentative." *Loera v. United States*, 714 F.3d 1025, 1028 (7th Cir. 2013). The state court judge's ruling on whether probable cause existed to support a search warrant for firearms and ammunition, however, was not a final determination on the issue of *seizure* because the warrant does not go so far as to preclude the officers from seizing a firearm that they find in plain view while searching for drugs. Indeed, as discussed herein, "[a]n officer executing a search warrant may seize … evidence that, *although not described in the warrant*, is subject to seizure under the plain view doctrine." *Russell*, 397 F.3d at 465 (emphasis added). That is the real issue here: whether Scott lawfully seized the shotgun. The state judge's ruling on the search warrant consequently has no preclusive effect on the matters of suppression and admissibility in this case, and thus, collateral estoppel is inapplicable.

or cabinet in the bedroom. Resolution of the first requirement, however, depends on whether Scott was lawfully present in the bedroom when the officers executed the search warrant. The parties stipulate that, after receiving the search warrant for drugs, officers called Scott to the scene to seize the firearms they had observed during the protective sweep. Upon his arrival, Scott was informed that the state court judge had excluded firearms from the warrant. The parties do not dispute that Scott was legally present in the bedroom pursuant to the search warrant, and Ford does not challenge the validity of that warrant, i.e., whether it was properly based on probable cause.

To the extent Ford implies that the officers used the search warrant as a pretext for seizing the sawed-off shotgun and other firearms, that argument undermines neither Scott's lawful presence at the scene nor the shotgun's seizure under the plain view doctrine. "[U]lterior motives [do] not strip officers of their legal justification to conduct searches." *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998) (citing *Whren v. United States*, 517 U.S. 806, 812 (1996)). In *Van Dreel*, police executed a search warrant of defendant's property for evidence of deer poaching violations. *See generally, id.* They were accompanied by a drug task force agent who had participated in two prior, unsuccessful searches of defendant's property for drugs. *Id.* at 904. During the search, the agent discovered incriminating evidence linked to his drug investigation and seized that evidence. *Id.* Even though the task force agent joined the officers "admittedly in hopes of finding evidence of drug dealing," the Seventh Circuit affirmed the denial of defendant's motion to suppress the drug evidence because the task force agent "was rightfully on the scene pursuant to a valid warrant allowing a search for evidence of hunting violations." *Id.* at 904-05. Holding that the agent's seizure of the drug evidence was justified under the plain view doctrine, the court explained:

> That the Drug Task Force officer might have hoped to find evidence relating to cocaine trafficking is irrelevant to the Fourth Amendment analysis under *Whren*, because once probable cause exists, and a valid warrant has been issued, the officer's subjective intent in conducting the search is irrelevant. Van Dreel does not challenge the validity of the hunting violations warrant, tacitly admitting the police had probable cause to believe they would find evidence of hunting violations on the premises. The officer's subjective intent is therefore irrelevant.

*Id.* at 905 (citing *Whren*, 517 U.S. at 812-13). It follows that, here, where Ford does not challenge the probable cause underlying the search warrant for drugs, Scott was lawfully present during the search of the bedroom pursuant to that warrant. Moreover, his subjective intent for being present—that is, to "come and seize the firearms" rather than to assist in the search for drugs—is not relevant for this Fourth Amendment analysis. Thus, the plain view doctrine's first factor has been met.[4]

As to the plain view doctrine's third requirement, the Court finds that the shotgun's incriminating nature was immediately apparent to Scott. "The immediately apparent standard does not require that a police officer know that certain items are contraband or evidence of a crime." *United States v. Lopez-Sanchez*, No. 3:11-CR-008, 2011 WL 3422836, at *10 (N.D. Ind. Aug. 4, 2011) (internal quotation marks and citations omitted). Rather, "[t]he incriminating nature of an object is 'immediately apparent' if, under the circumstances, the officer has

---

[4] The government also argues that Scott's status as a "federal officer" does not undermine his lawful presence during the execution of the state court search warrant. [DE 80 at 5-6] The record does not clearly indicate whether Scott is indeed a federal law enforcement officer or whether he is a local/state officer detailed to a task force comprised of both local and federal personnel. But regardless, the Court agrees with the government on this point. Scott's federal connection, whatever it may be, does not impact the outcome here. While states are free to regulate searches and seizures as they see fit (such as through the search warrant's boundaries here), "state restrictions do not alter the Fourth Amendment's protections." *Virginia v. Moore*, 553 U.S. 164, 176 (2008); *see also United States v. Brewer*, 915 F.3d 408, 414-15 (7th Cir. 2019) (citing *Moore*, confirming that "state law does not by proxy heighten the Fourth Amendment's protections," and holding that the Fourth Amendment provides no remedy for a federal task force's noncompliance with a state-based warrant's geographical restriction).

'probable cause to believe that the item is linked to criminal activity.'" *Russell*, 397 F.3d at 465 (quoting *United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997)).[5]

Shotguns with barrels shorter than eighteen inches must be registered in order to be lawfully possessed, 26 U.S.C. §§ 5845(a), 5861(c), and in this case, based on a photograph submitted by the parties, the shotgun's barrel is plainly shorter than that; its barrel is no more than a few inches long, extending only about half way along a package of cookies next to which it rested. [DE 85 at 6] Thus, the short length of the sawed-off barrel here rendered the shotgun's incriminating nature immediately apparent to Scott. *See United States v. Decoteau*, 932 F.2d 1205, 1207 n.1 (7th Cir. 1991) (noting that, despite the existence of a narrow statutory exception permitting legal possession, courts have held that witnessing a person in possession of a sawed-off shotgun gives rise to probable cause to believe that the firearm is unregistered); *see also Lopez-Sanchez*, 2011 WL 3422836, at *10 ("Courts have repeatedly upheld the seizure of firearms that reasonably appeared unlawfully short to officers.") (collecting cases).

With all three of the plain view doctrine's criteria met, Scott's seizure of the sawed-off shotgun in this case did not offend the Fourth Amendment.[6] But even still, other rationales

---

[5] Indeed, the Supreme Court has recognized that "the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." *Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980)).

[6] Even if Scott or the other officers had inadvertently stumbled upon the shotgun as a result of their search efforts (such as by finding it in a drawer, for example, as opposed to observing it in the open), subsequent handling and inspection of the firearm would still have been permitted within the boundaries of the search warrant; the warrant authorized a search of the entire bedroom, the firearms were located inside that room, and the firearms themselves could have contained drugs. *See Lopez-Sanchez*, 2011 WL 3422836, at *8 (citing *United States v. Wayne*, 903 F.2d 1188, 1196 (8th Cir. 1990)); *see also United States v. Torres*, 32 F.3d 225, 231 (7th Cir. 1994) ("Moreover, we note that permission to search a specific area for narcotics … may be construed as permission to search any compartment or container within the specified area where narcotics may be found.") (internal quotation marks and citation omitted). At that point, the short length of the barrel would have rendered its incriminating nature obvious and its seizure practically unavoidable and justified under the plain view doctrine (and indeed, the same would be true even without further inspection of the weapon for drugs). *See United States v. Klebig*, 228 F. App'x 613, 618-19 (7th

11

independently serve to justify its seizure. First and foremost, Scott's seizure of the shotgun, along with the other firearms and ammunition, was justified to ensure the other officers' safety as they searched. *See Lopez-Sanchez*, 2011 WL 3422836, at **9-10 (collecting cases). In addition, despite the state court judge's decision to exclude firearms and ammunition from the search warrant, once the officers found evidence of illegal drug activity, the shotgun's seizure was proper since the firearms became evidence of the drug activity itself.

      Courts have often noted that firearms "are recognized as tools of the drug trade; thus, courts have sustained the admission of weapons evidence in narcotics cases because the possession of a weapon is often a hallmark of drug trafficking." *United States v. Duran*, 407 F.3d 828, 838 (7th Cir. 2005) (quoting *United States v. Hubbard*, 61 F.3d 1261, 1270 (7th Cir.1995)). According to the Seventh Circuit, this connection stems from the fact that "the possession of a gun can advance the possession and future distribution of narcotics by protecting the drugs or the drug dealer." *United States v. Perez*, 581 F.3d 539, 547 (7th Cir. 2009); *accord United States v. Blanchard*, 542 F.3d 1133, 1141 (7th Cir. 2008) ("[T]he firearm is an indication of drug activity, and participation in drug trafficking supplies a motive for having the gun.") (quoting *Hubbard*, 61 F.3d at 1270)); *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005) ("[G]uns found in close proximity to drug activity are presumptively connected to that activity."); *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) (holding that officers had probable cause to seize an empty ammunition box because when "[c]oupled with the seized drugs, weapons, and photographs, the ammunition box is probative of the use of weapons in connection with drug trafficking in violation of federal law").

---

Cir. 2007) (seizure of illegal firearm and silencer inadvertently discovered by officers under bed and in closet during search for chemicals justified under the plain view doctrine).

The officers here were conducting a search as part of an investigation into drug activity. In such settings, courts uphold the seizure even of otherwise *legal* weapons found. *Lopez-Sanchez*, 2011 WL 3422836, at *7 (citing *United States v. Lowe*, 389 F. App'x 561, 561 (7th Cir. 2010) (upholding the seizure of firearms by officers searching for evidence of cocaine trafficking); *United States v. Wayne*, 903 F.2d 1188, 1196 (8th Cir. 1990) ("The connection between drug activity and the weapons, communication equipment, and grinder, was readily apparent to the experienced officers executing the search and, therefore, their seizure was proper under the Fourth Amendment.")). In this case, officers did not find the firearms in a vacuum; officers found the guns in the same bedroom along with drugs, drug paraphernalia, and evidence of possible drug distribution (scales). Seizure of these weapons as evidence of drug activity was proper, independent of the plain view doctrine.

## CONCLUSION

The officers in this case conducted a reasonable protective sweep of Ford's bedroom, and their observations during that sweep supplied probable cause for a search warrant for drugs. During the subsequent search pursuant to that warrant, task force agent Scott seized a sawed-off shotgun, and that seizure was justified under the plain view doctrine. As a result, the Court **DENIES** Ford's motion to suppress. [DE 51]

SO ORDERED.

ENTERED: June 27, 2019

                                                     /s/ JON E. DEGUILIO
                                                  Judge
                                                  United States District Court